## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| GWENDOLYN PIERCE | ) | |
| 11512 Leland Place | ) | |
| Waldorf, Maryland 20601 | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| ASHTON CARTER, | ) | |
| SECRETARY OF THE UNITED | ) | |
| STATES DEPARTMENT OF DEFENSE | ) | |
| 1400 Defense Pentagon | ) | |
| Washington, D.C. 20310 | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT FOR DISCRIMINATION

COMES NOW Plaintiff Gwendolyn D. Pierce, by and through undersigned counsel, and states as follows:

1.     Plaintiff brings this action pursuant to Title VII of the United States Civil Rights Act for discrimination in employment and retaliation on the basis of race, gender, and protected activity.

## JURISDICTION AND VENUE

2.     Jurisdiction of this court is founded pursuant to 28 U.S.C. § 1331.

3.     Venue lies in this Court, pursuant to 42 U.S.C. § 2000e-5(f)(3) since the employment practices alleged to be unlawful were committed by defendant and its agents within the District of Columbia and it is a claim against an agency of the United States through its Secretary.

## PARTIES

4.      Plaintiff, Gwendolyn D. Pierce, ("Ms. Pierce"), is an adult African-American female, a citizen of the United States and a bona fide resident of the state of Maryland.  At all times further relevant herein, Ms. Pierce was an employee of the National Geospatial-Intelligence Agency of the United States Department of Defense at the Washington Navy Yard.

5.      Ashton Carter is the Secretary of the United States Department of Defense, a duly-authorized and organized department of the United States of America with its headquarters located in Washington, D.C.  The Department of Defense is subject to the prohibitions against discrimination and retaliation pursuant to Title VII of the United States Code.

6.      The National Geospatial-Intelligence Agency (the "Agency" or "NGA") is a combat support and intelligence agency under the U.S. Department of Defense.

## FACTS COMMON TO ALL COUNTS

7.      Gwendolyn Pierce began her professional career as a US Army Senior Graphic Documentation Specialist in 1978.  Ms. Pierce ended her military career in 1993.  In 1995, Ms. Pierce was first employed by a predecessor agency of NGA as a Visual Information Specialist. In 2000, Ms. Pierce became a Graphic Designer for the same agency until 2004 when she became a Visual Information Specialist-Multimedia Specialist. In 2001, Gwendolyn Pierce was promoted to Visual Information Specialist, Pay Band 4. In 2007, Ms. Pierce was reassigned to the position of Multimedia Specialist, Pay Band 4, with a base pay of $71,693.00 and a total pay (base and locality)  of  $85,021.00.

2

8.     In 2008, Ms. Pierce's base pay rose to $73,647.00 and her total pay was $89,032.00.  In 2009, Ms. Pierce's base pay was increased to $75,783.00 and her total pay rose to $93,289.00.   In 2010, Ms. Pierce's base pay was $78,443.00 and her total pay was $97,442.00. Finally, Ms. Pierce's total pay in 2011 rose to $98,983.00.

9.     Since 2003, Ms. Pierce has filed about five complaints against the Agency and her supervisors alleging discrimination. At various times, those complaints have raised issues regarding racial bias by her current second and third line supervisors Constance Johansen, Todd Veitl, as well as a former supervisor,  Vicky Roach.

10.    In June 2010, Ms. Pierce filed an informal EEO complaint against the Agency alleging a racially hostile work environment when an Agency employee displayed a doll of a monkey hung in a noose in the workspace.

11.   In 2009-2010, Ms. Pierce received a "Special Acts Award" and "Individual Cash Award." Ms. Pierce's rater failed to take these awards into account in assessing her work performance.

12.   When Ms. Pierce protested her overall rating under "Performance Objectives," the rater told Ms. Pierce that she would have to "find Osama bin Laden" in order to justify a higher rating.

13.    As to Performance Objective 1, the rater failed to sufficiently account for the long-term assignments, including what the rater acknowledged was "a very large project," given to Ms. Pierce that would have had the effect of reducing her total number of products completed.

14.   As to Performance Objective 2, although the rater acknowledged that Ms. Pierce "always informed management of problems that would affect productivity or

3

quality," the rater minimized the well-documented and on-going computer problems that effected her work productivity.

15. As to Performance Objective 3, the rater cited vague issues relating to the "tone" of Ms. Pierce's emails as a basis for her rating and according to the rater, told Ms. Pierce that she should be "extra nice" in her communications. Ms. Pierce denies that the rater ever instructed her to be "extra nice" or that it was a proper basis for her rating.

16. As to Performance Element - Accountability, the rater in giving Ms. Pierce a rating of 3 minimized the extent to which Ms. Pierce's "Special Act Award" demonstrated mastery of this performance element.

17. As to Performance Element - Communication, the rater cited Ms. Pierce's supposedly sub-par writing skills and her failure to take writing courses as a basis for her rating. From 2003 to 2009, however, Ms. Pierce had taken 116 hours of writing courses sponsored by NGA.

18. As to Performance Element - Critical Thinking, the rater raised Ms. Pierce's apparent need for help resolving "computer-related problems." Ms. Pierce, however, is not a computer technician and being one is not an element in her performance plan.

19. As to Performance Elements - Engagement and Collaboration/Professional Leadership and Integrity, the rater claimed that Ms. Pierce did not provide "extra contributions" or "solicit other's ideas" as a basis for her rating in this category. The rater minimized Ms. Pierce's multimedia training course designed and implemented by her.

20. Performance Element - Technical Expertise, the rater complained about Ms. Pierce's inability to use basic consumer computer programs such as MS Outlook. Ms. Pierce, who is well-versed and provides training in a variety of sophisticated graphic

4

software, denies that she has any inability to use basic consumer software.

21.    Indeed, Ms. Pierce created a hands-on training session with a training manual, CD Rom and a website to assist PK employees in enhancing their skills in multimedia. Ms. Pierce trained each of the employees in one-on-one sessions to use the software application Adobe Flash and Adobe Dreamweaver.

22.    As a result of her performance rating, Ms. Pierce received a performance increase of 1.6%. Ms Pierce received the lowest rating of *any* Multimedia Band 4 employee and the lowest pay increase.

23.    Although Ms. Pierce had been within the Band 4 category since at least 2006, as a result of her performance rating, her total pay was still only 18% of the maximum compensation for a Band 4.

24.    In about March of 2012, Ms. Pierce was approved for leave under worker's compensation. At the time of her taking leave, Ms. Pierce's pay was the equivalent to the mid-range compensation for a Band 3.

25.    At least three of the other Multimedia Band 4 employees, Mark Eberhart, Marti Spaulding and Michael Spinella, were hired or promoted into the position *after Ms*. Pierce. Each of these employees' compensation is at least $15,000.00 more than Ms. Pierce's.  Each of these employees, further, is compensated within the middle range of the Band 4 pay schedule.

26. Mark Eberhart, a white male, began his government service with his appointment as a Band 4 Multimedia Specialist in 2009.  He was given a base pay of $87,332.00, with an adjusted total pay of $107,506.00 in 2009.  Although, Pierce had two years of experience more than Mr.  Eberhart as a Band 4 Multimedia Specialist with the

5

Agency *and* in grade, Mr. Eberhart began his tenure with a base salary almost $12,000.00 more than Ms. Pierce. In 2010, Mr. Eberhart's total compensation was increased to $112,081 and in 2011, his pay rose to $114,792.00.

27.   Marti Spaulding, a white female, also began her career tenure with the government in 2009 as a Multimedia Specialist, Band 4.  She was awarded a base pay of $87,586.00, with an adjusted total pay of $107,818.00.  By 2010, Ms. Spaulding's total pay compensation was $111,637.00 and in 2011, her pay was $115,136.00.

28.   Michael Spinella, a white male, was promoted to a Band 4 Multimedia Specialist in 2008. His base pay, as a result of this promotion, jumped from $69,920.00 to $74,115.00 for a total adjusted pay of $89,598.00. In 2009, Mr. Spinella received a 2.9 percent raise to a base pay of $78,721.00 and a total pay of $96,906.00. In 2010, Mr. Spinella's base pay increased to $82,541.00 and a total increase to $102,532.00. In 2011, Mr. Spinella's base pay was $84,900.00 and a total pay of $105,463.00.

29.   Upon information and belief Shirley Hogan, a white woman, Michael Hogston, a white male, and Patricia Disandro, a white female, have current compensation substantially higher than Ms. Pierce.

30.   Each of the similarly situated comparable white employees all performs the same work in the same office. These employees are rated on the identical critical performance elements and standards and have the same job descriptions: the design and production of interactive products using the software application Adobe Flash. All Multimedia Specialists perform duties as a graphic designer, scanning images, the use of digital video and/or animation software to integrate graphic with text and audio, writing CD-ROMs/DVD, importing and exporting data and archiving electronic publishing.

31. At the time of her 2009-2012 performance appraisal, Ms. Pierce's compensation by the Agency had lagged substantially behind her colleagues. This was the case despite Ms. Pierce's significant seniority and tenure in the position and grade.

32. When Ms. Pierce received a performance rating that was, once again, lower than any of her Multimedia Band 4 peers, she correctly assessed that the almost 20 percent disparity in her pay compared to her peers could not *rationally* be the result of chance or, given her experience and tenure, her *actual* performance.

33. On or about April 11, 2011, and subsequent amendments, Ms. Pierce filed a formal complaint of race and gender discrimination, as well a claims for unlawful retaliation. On or about March 2, 2015, Ms. Pierce received a notice of her right to file suit from the EEOC and, accordingly, has exhausted her administrative remedies.

### FIRST CAUSE OF ACTION
### Violation of Title VII – Race and Sex Discrimination

34. Plaintiff herein adopts and incorporates by reference all the allegations set forth in paragraphs "1" through "33" as if originally pleaded herein.

35. Defendant, through its agents or supervisors, unlawfully discriminated and denied Ms. Pierce equal employment opportunities because of her race and sex when it denied her equal employment opportunities and subjected her to disparate treatment that resulted in substantial pay disparities between Ms. Pierce and other similarly situated personnel, without cause of justification, in violation of Title VII of the Civil Rights Act of 1964, as amended.

36. As a direct and proximate result of the illegal employment discrimination by Defendant, Ms. Pierce has suffered, and continues to suffer, severe pain and suffering and

extreme mental anguish and emotional distress. Ms. Pierce has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities.

WHEREFORE plaintiff respectfully prays this Court:

(a) To award her, under Title VII of the Civil Rights Act, all the back and front pay and fringe benefits she has lost as a result of defendant's unlawful discrimination against her;

(b) To award her, under Title VII of the Civil Rights Act, compensatory damages in the amount of $300,000.00;

(c) To award her reasonable attorney's fees and costs of this action; and

(d) To award her such other and further relief as this Court deems just and proper.

### SECOND CAUSE OF ACTION
### Violation of Title VII – Retaliation

37. Plaintiff herein adopts and incorporates by reference all the allegations set forth in paragraphs "1" through "36" as if originally pleaded herein.

38. By the actions set out above, defendant subjected Ms. Pierce to unlawful retaliation and denied her the rights and privileges secured by Title VII, when it denied her equal employment opportunities and subjected her to disparate treatment that resulted in substantial pay disparities between Ms. Pierce and other similarly situated personnel, without cause of justification, in violation of Title VII of the Civil Rights Act of 1964, as amended, because she had engaged in protected activity under the United States Civil Rights Act.

39. As a direct and proximate result of the illegal employment action by defendant, Ms. Pierce has suffered, and continues to suffer, severe pain and suffering and extreme mental anguish and emotional distress. Ms. Pierce has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities.

WHEREFORE plaintiff respectfully prays this Court:

(a)     To award her, under Title VII of the Civil Rights Act, all the back and front pay and fringe benefits she has lost as a result of defendant's unlawful discrimination against her;

(b)     To award her, under Title VII of the Civil Rights Act, compensatory damages in the amount of $300,000.00;

(c)     To award her reasonable attorney's fees and costs of this action; and

(d)     To award her such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff respectfully requests a jury trial on all issues.

Respectfully submitted,

*/s/ Lisa Alexis Jones*
Lisa Alexis Jones, Esq.
Lisa Alexis Jones, PLLC
One Rockefeller Plaza
10th Floor
New York, N.Y. 10020-2003
(646) 756-2967
(888) 755-6778 (Fax)
ljones@lisaajones.com

*Counsel for Gwendolyn D. Pierce*

Dated: May 27, 2015